[No. A044982. First Dist., Div. Four. Apr. 8, 1992.]

PAUL OSBORN et al., Plaintiffs and Appellants, v.
IRWIN MEMORIAL BLOOD BANK et al., Defendants and Appellants.

## Counsel

Michael J. Moriarty and John Daniel for Plaintiffs and Appellants.

Charles Bond, Stefanie Gandolfi, O'Connor, Cohn, Dillon & Barr, Duncan Barr, Lisa Ungerer, James C. Martin, John McDougall Kern, Mary C. Oppedahl, Paul D. Fogel and Crosby, Heafey, Roach & May for Defendants and Appellants.

Hassard, Bonnington, Rogers & Huber as Amici Curiae on behalf of Defendants and Appellants. Fred J. Hiestand as Amicus Curiae.

## OPINION

**PERLEY, J.**—The trial in this case has been reported as the first in the nation where a blood bank was found liable in connection with transmission of the acquired immune deficiency syndrome (AIDS) virus by a blood transfusion.

In February of 1983, at the age of three weeks, Michael Osborn contracted the AIDS virus from a blood transfusion in the course of surgery on his heart at the University of California at San Francisco Medical Center. The blood used in the operation was supplied by the Irwin Memorial Blood Bank. Michael and his parents, Paul and Mary Osborn, sued Irwin and the University for damages on various theories. The only causes of action that survived defense motions for nonsuit and directed verdict were claims against Irwin for negligence, and intentional and negligent misrepresentation. After the jury returned a general verdict for plaintiffs, the court granted Irwin's motion for judgment notwithstanding the verdict on the intentional misrepresentation and negligence claims. Irwin was thus held liable only for a negligent misrepresentation.

The cause of action for negligent misrepresentation was based on a statement to the Osborns by Irwin's receptionist that blood donations could not be earmarked for use in Michael's operation. That statement could be construed as a misrepresentation in light of evidence that Irwin's policy at the time was to discourage rather than prohibit directed donations. Irwin offered to prove that Michael had a rare blood type and hence could not have received any blood from members of his family. Irwin also wanted to show that friends of the family who had agreed to donate for Michael could have provided only a small fraction of the rare blood he needed. This evidence was relevant to proximate cause. To the extent that Michael could not have used directed donations, a statement that prevented those donations did not affect the outcome of his case. However, the court excluded evidence associated with Michael's rare blood type. We conclude that the court erred, that the error was prejudicial to Irwin and thus a new trial on the claim of negligent misrepresentation is required.

The most significant issue on appeal is whether Irwin was entitled to judgment notwithstanding the verdict on the issue of negligence. Qualified experts opined for plaintiffs that Irwin's blood testing and donor screening practices prior to Michael's surgery were negligent in light of concerns about

AIDS at the time. On matters such as these that are outside common knowledge, expert opinion is ordinarily sufficient to create a prima facie case. Here, however, there was uncontradicted evidence that Irwin was doing as much if not more in the areas of testing and screening than any other blood bank in the country, and there is no question that it followed accepted practices within the profession. We hold that Irwin cannot be found negligent in these circumstances.

We also conclude that the University's motions for nonsuit and directed verdict were properly granted, and accordingly affirm the judgment in favor of the University.

## I. INTRODUCTION

### A. *Michael Osborn's Medical Case*

Michael Osborn was born on January 28, 1983, with isolated ventricular inversion, a rare and life-threatening heart condition that prevented unoxygenated blood from circulating to his lungs. He underwent surgery at the University on February 24, 1983, to repair this condition. It is undisputed that the surgery was necessary and successful. During the course of the procedure, Michael received 12 units or components of blood supplied by Irwin. The necessity of those blood transfusions is undisputed. Michael played normally and showed no symptoms of AIDS for over four years.

In August of 1987, the Osborns received a letter from the University recommending that Michael be tested for the antibody to the AIDS virus. The letter noted that he had received transfusions before April of 1985, at a time when no test for AIDS was available. Michael tested positive, and it is undisputed that he contracted AIDS from a transfusion he received incident to his heart surgery. In late February, 1988, Michael's speech became slurred and he began walking with a limp. He was diagnosed with an AIDS-related brain tumor and underwent surgery for its partial removal. He was receiving medication for swelling of the brain at the time of trial herein. Michael testified briefly at the trial. We have been advised that he has died during the pendency of this appeal.

The donor whose blood transmitted the AIDS virus to Michael has not been identified.

### B. *Procedural History*

This suit was filed in May of 1988. The first amended complaint included causes of action against the University for medical malpractice, breach of

contract, intentional and negligent misrepresentation, intentional and negligent infliction of emotional distress, negligent screening of medical staff, battery, and simple negligence. Plaintiffs asserted claims against Irwin for negligence, breach of contract, intentional and negligent misrepresentation, intentional and negligent infliction of emotional distress, battery, and products liability.

The case was tried to a jury in November of 1988, after the court granted plaintiffs' motion for calendar preference based on Michael's illness. The University and Irwin moved for nonsuits when plaintiffs rested. The motion was granted on all claims except those of negligence, and intentional and negligent misrepresentation against Irwin, and those of malpractice, negligent misrepresentation and negligent infliction of emotional distress against the University. After Irwin and the University presented their defenses, the court granted the University's motion for a directed verdict on the remaining claims against it.

Claims against Irwin for negligence, and intentional and negligent misrepresentation were submitted to the jury. Irwin requested a general verdict. The jury returned a 9-3 decision against Irwin, awarding damages of $550,000 to Michael and $200,000 to his parents.

Irwin then moved for judgment notwithstanding the verdict and a new trial. The motion for new trial was supported, inter alia, by the affidavits of five jurors stating that negligent misrepresentation was the sole basis for their finding of liability. Irwin also moved for entry of an amended judgment reflecting the damage limitations of the Medical Injury Compensation Reform Act (MICRA). Plaintiffs opposed Irwin's motions and moved to strike the juror affidavits.

At the conclusion of the first hearing on the posttrial motions, the court granted Irwin judgment notwithstanding the verdict on the claims of intentional misrepresentation and negligence. The court acknowledged at subsequent hearings that Irwin had unsuccessfully urged throughout the case that claims against it were subject to MICRA. The court also acknowledged that it had erred in concluding that MICRA did not apply. Irwin argued that this error required a new trial. Irwin also argued that, if the court was not inclined to grant a new trial, it could amend the judgment to conform the damage award to MICRA. Irwin submitted that the general verdict could be recalculated in accordance with MICRA based on the evidence of damages at trial, and two juror affidavits about how much of the award represented unreimbursed medical expenses, pain and suffering, and future damages. Irwin suggested that the court could use "its remittitur power" and grant a "new trial conditionally" to effect this result.

The court decided to conditionally grant the motion for new trial, subject to plaintiffs' acceptance of an amended judgment for reduced and deferred damages. The motion to amend the judgment was granted as follows: "[Irwin] shall pay a lump-sum payment to plaintiffs in the amount of $250,100 in present damages; future damages of $250,000 are to be paid to Michael Osborn periodically in equal annual installments commencing on his eighteenth (18th) birthday, and continuing each year until his sixty-fifth (65th) birthday. Inasmuch as the Court finds that Michael Osborn owes no duty of support to anyone, the Court, in conformity with the spirit and intent of [Code of Civil Procedure] § 667.7, hereby orders that any unpaid future damages revert to defendant IRWIN in the event of Michael Osborn's death prior to payment in full." In between these sentences, which were typed on Irwin's form, the court inserted the handwritten notation, "$165,207 for nursing care."

Although the court granted plaintiffs' motion to strike the juror affidavits, it appears to have generally accepted Irwin's breakdown of present and future damages based on those affidavits. The $250,100 figure for present damages appears to represent $250,000 for Michael's pain and suffering, plus $100 for his parents' unreimbursed medical expenses. The $250,000 figure for future damages appears to cover Michael's lost earnings. Although the $165,207 figure appears to cover Michael's future nursing care, the court indicated in response to questions from the parties that this amount was payable in a lump sum as present damages. Since Michael was not expected to live to age 18 there was no real prospect for payment of any of the future damages awarded under the amended judgment. The court thus in effect reduced the award from $750,000 to $416,307.

Plaintiffs accepted the reduced award in lieu of a new trial and these appeals ensued. Plaintiffs contend that MICRA does not apply to Irwin, and thus that the court erred by amending the judgment in an attempt to conform it to MICRA. Plaintiffs also contend that the court misapplied MICRA when it provided for periodic future payments of lost earnings. Irwin contends that a new trial is required because certain of the jury instructions were erroneous, the court improperly used a remittitur, and it could not grant a partial judgment notwithstanding the verdict. Plaintiffs and Irwin discuss at length some of the evidence on Irwin's alleged negligence, presumably on the issue of whether judgment notwithstanding the verdict was properly granted on that cause of action. Irwin contends that it is entitled to judgment on the claim of negligent misrepresentation, or that a new trial on this cause of action is required. Finally, plaintiffs contend that the court erroneously granted the University's motions for nonsuit and directed verdict.

## II. Claim of Negligent Misrepresentation Against Irwin

### A. *Background*

Mr. and Mrs. Osborn knew that Michael's heart surgery would entail blood transfusions, they had learned of AIDS from newspapers and television, and they were afraid that AIDS could be transmitted by blood. They therefore spoke with seven of Mary Osborn's brothers and sisters, as well as thirty-five people at the office of Pacific Bell where they both worked, about donating blood for the operation, all of whom were willing to help. Three days before the operation, the Osborns asked Dr. Paul Stanger at the University whether they could arrange to have their blood, or the blood of family and friends, used in Michael's surgery. Stanger told them that they would have to take up the subject of directed donations with Irwin.

After talking with Dr. Stanger, the Osborns went to Irwin and spoke with Irwin's receptionist. They told the receptionist that they wanted to donate blood for use in their infant's heart surgery because they were worried about AIDS. The Osborns testified that the receptionist advised them that their donations would be credited to Michael's account, but could not be reserved specifically for his use. It was too soon after pregnancy for Mary Osborn to give blood, but Paul Osborn proceeded to make a donation. The claim of negligent misrepresentation is based on the receptionist's statement to the Osborns that Irwin did not accept directed donations.

The Osborns introduced evidence that Irwin's policy at the time was to discourage directed donations, rather than forbid them. A February 4, 1982, memorandum to Irwin personnel from its medical director, Dr. Herbert Perkins, indicates that directed donations were routinely accepted only in a few situations, not present in Michael's case, where they were deemed medically justified. Directed donations were otherwise discouraged, according to the memo, but they would be accepted if the patient and the patient's physician insisted on them. Dr. Perkins testified that Irwin's staff was informed of this policy. At trial, however, the receptionist did not recall that Irwin had a policy on directed donations at the time, and neither did Brian McDonough, who was then Irwin's executive director.

■ Recovery for negligent misrepresentation involving a risk of physical harm requires proof that: (1) the defendant had a duty to exercise reasonable care in giving the information in question; (2) the defendant gave false information with a degree of culpability at least equal to negligence; (3) the plaintiff actually and reasonably relied on the misrepresentation; and (4) reliance on the misrepresentation proximately caused the plaintiff's

injury or death. (*Garcia* v. *Superior Court* (1990) 50 Cal.3d 728, 735-737 [268 Cal.Rptr. 779, 789 P.2d 960]; *Weissich* v. *County of Marin* (1990) 224 Cal.App.3d 1069, 1081 [274 Cal.Rptr. 342].) It is apparently conceded that there was sufficient evidence for the jury to conclude that Irwin's receptionist negligently misrepresented its directed donations policy, and that the Osborns reasonably relied on that misrepresentation. Irwin's arguments with respect to negligent misrepresentation focus exclusively on proximate cause.

Plaintiffs' sole response to those arguments is that proximate cause "is not even an element" of the cause of action for negligent misrepresentation. That is obviously incorrect. (*Garcia* v. *Superior Court, supra*, 50 Cal.3d at p. 737; *Weissich* v. *County of Marin, supra*, 224 Cal.App.3d at pp. 1081, 1083-1084; see also, e.g., *Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 376 [193 Cal.Rptr. 422] [defendant liable for injury "resulting from" reliance on misrepresentation]; *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680, 686 [81 Cal.Rptr. 519] [same]; BAJI No. 12.45 (7th ed. 1986) p. 32 [same]; Rest.2d Torts, § 311.)

B. *Irwin Is Not Entitled to Judgment*

Irwin contends that plaintiffs cannot establish a prima facie case that denial of directed donations proximately caused Michael to contract AIDS, because there is no scientific evidence that blood from family and friends is any safer than blood from routine (homologous) donations by the general public. Several witnesses testified without contradiction that as of February, 1983, there were no studies on the relative safety of directed donations. In support of its motion for new trial, Irwin submitted statistics it compiled in 1988 showing that there was no significant difference in the risk of contracting AIDS from homologous and directed donations. Irwin also submitted a 1987 study for the Washington State Legislature which reached the same conclusion.

Irwin has emphasized to us and to the trial court that the State of Washington refused to mandate directed donations in light of this study. We note that California enacted a law requiring allowance of directed donations, despite the alleged lack of evidence of their utility. Subdivision (a)(1) of Health and Safety Code section 1628, which evidently expired on January 1, 1992, provided that "No person shall prohibit any individual from . . . [¶] [m]aking blood donations to be used directly for blood transfusions for an individual designated by the donor . . . ." (See also Health & Saf. Code,

§ 1645 [patients receiving blood transfusions must be apprised of the "positive and negative aspects" of directed donations].)[1] We will nonetheless assume for purposes of Irwin's argument that no studies have proven that the use of directed donations decreases the risk of contracting AIDS from a transfusion. Irwin submits that the absence of such proof precludes plaintiffs from establishing proximate cause by a preponderance of the evidence, and thereby dictates a judgment in Irwin's favor on the claim of negligent misrepresentation. (See generally 1 Witkin, Cal. Evidence (3d ed. 1986) §§ 132, 133, 157 and authorities cited [burden of proof in civil cases]; Rest.2d Torts, § 433B.)

■ The concept of proximate or legal cause has "defied precise definition." (*Maupin* v. *Widling* (1987) 192 Cal.App.3d 568, 573 [237 Cal.Rptr. 521]; see also Wright, *Causation in Tort Law* (1985) 73 Cal.L.Rev. 1735, 1737.) It is reasonably well settled, however, that the causation inquiry has two facets: whether the defendant's conduct was the "cause in fact" of the injury; and, if so, whether as a matter of social policy the defendant should be held legally responsible for the injury. (See *Maupin* v. *Widling, supra*, 192 Cal.App.3d at pp. 573-574, and authorities cited; and Rest.2d Torts, § 431 [definition of legal cause].) The issue presented here is solely one of "causation in fact."

■ Whether a defendant's conduct actually caused an injury is a question of fact (*Maupin* v. *Widling, supra*, 192 Cal.App.3d at p. 573) that is ordinarily for the jury (Rest.2d Torts, § 434, subd. (2)(a)). ■ The two widely recognized tests for establishing cause in fact are the "but for" rule, which asks whether the injury would not have occurred but for the defendant's conduct, and the rule set forth in the Restatement Second of Torts section 431, subdivision (a), which asks whether the defendant's conduct was a "substantial factor in bringing about the harm." (*Maupin* v. *Widling, supra*, 192 Cal.App.3d at p. 574.) Our Supreme Court has recently observed that the "substantial factor" test generally subsumes the "but for" test. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052-1053 [1 Cal.Rptr.2d 913, 819 P.2d 872].)

---

[1]Those who supported California's laws on directed donations believed that they would help prevent the transmission of disease, despite Irwin's data that homologous donations presented no greater risk. (See Assem. Office of Research, 3d reading analyses of Sen. Bill No. 1542 (1986 Reg. Sess.) and Sen. Bill No. 1008 (1987 Reg. Sess.); see also Anderson, *The AIDS Crisis and Directed Donations* (1991) 37 Med. Trial Technique Q. 451, 466-467 ["individuals are acting reasonably to trust their common sense and have a hand in the selection of their donor" even if one "accepts the premise and scientific data that directed donations are no safer"]; and cf. Comment (1984) 12 San Fernando Val.L.Rev. 11, 22 [directed donations should be allowed because recipient "can know with relative certainty the health status of his immediate family members"].)

However the test is phrased, causation in fact is ultimately a matter of probability and common sense: "[A plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. In drawing that conclusion, the triers of fact are permitted to draw upon ordinary human experience as to the probabilities of the case." (Rest.2d Torts, § 433B, com. b.)

■ A causal connection between the misrepresentation and the harm is readily apparent, as a matter of common sense, in Michael's case. Conduct can be considered a substantial factor in bringing about harm if it "has created a force or series of forces which are in continuous and active operation up to the time of the harm" (Rest.2d Torts, § 433, subd. (b)), or stated another way, "the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another" (Rest.2d Torts, §§ 439, 433, com. e.). A "continuous" chain of cause and effect is manifest here: Michael received blood from Irwin's donor pool because Irwin misrepresented that directed donations were not available; and he contracted AIDS because Irwin's blood was contaminated, just as his parents feared it would be.

A lack of evidence that directed donations are safer does not in any event preclude a finding that, but for the failure to allow those donations, Michael probably would not have contracted AIDS. In support of Irwin's motion for new trial, Dr. Perkins declared that the risk of contracting the AIDS virus from a blood transfusion may have been as high as 1 in 100 in early 1983. However, Irwin does not argue that at this time it was more likely than not that any recipient of 12 units of blood would get the AIDS virus. If the chances of that happening were less than 50 percent, as is evidently conceded, then it is probable that Michael would not have been harmed by blood from 12 directed donations, or for that matter, any 12 units from Irwin's regular donor pool other than those he actually received. It appears that directed donations probably would have saved Michael's life.

We therefore hold that lack of scientific proof of the relative safety of directed donations is not conclusive in Irwin's favor on the issue of proximate cause.

## C. *Irwin Is Entitled to a New Trial*

Over Irwin's objection, the court excluded evidence that Michael had a relatively rare blood type, A-negative. Irwin advised the court that this evidence would show that none of Michael's family could have donated blood for him because their blood types were incompatible with his. This evidence would also have shown that the 35 friends lined up to donate for Michael probably could have provided only a small fraction of the rare blood he needed. Irwin argued that these facts were probative because they indicated that most all of the blood for Michael's operation would have come from Irwin's public donor pool even if no misrepresentation had occurred, and all of the directed donations arranged by his parents had been obtained.

 Evidence associated with Michael's rare blood type was relevant to proximate cause. The trial court appears to have excluded this evidence on the ground that the parents' failure to secure directed donations stemmed from Irwin's misrepresentation rather than Michael's rare blood type. The court stated that "the problem . . . was not in the difficulty of getting the blood; it was in the fact that they asked, requested, and wanted to get to do it themselves, and they were turned down." However, an additional problem presented by the rare blood type was the extent to which any of the directed donations that would have been obtained could have been used. Ordinarily, of course, "the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent." (Rest.2d Torts, § 432, subd. (1).) If directed donations for Michael would not have been feasible, a misrepresentation precluding those donations did not affect the outcome of his case. We conclude that the court erred when it excluded evidence relating to Michael's blood type.[2]

We also find that the error was prejudicial to Irwin. Erroneous exclusion of evidence is grounds for reversal if in light of the entire record " '. . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Clifton* v. *Ulis* (1976) 17 Cal.3d 99, 105-106 [130 Cal.Rptr. 155, 549 P.2d 1251]; *Loftleidir Icelandic Airlines, Inc.* v. *McDonnell Douglas Corp.* (1984) 158 Cal.App.3d 83, 95-96 [204 Cal.Rptr. 358].) The error may be deemed harmless if the

---

[2]We are not persuaded by Irwin's argument that it should have been allowed to show that one of the uncles asked to donate blood for Michael had AIDS at the time. This would have been no more than anecdotal evidence that directed donations are not necessarily safe. It did not otherwise tend to prove that Michael might have been harmed if directed donations had been accepted because, as Irwin's counsel represented to the trial court, Michael could not have taken any blood from family members. The potential prejudicial effect of this evidence outweighed its limited probative value.

excluded evidence was "immaterial or of so little materiality or value that its admission would not have had any substantial influence on the result," or it "would have been merely cumulative or corroborative of evidence properly in the record." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 339, p. 346.) On the other hand, exclusion of admissible evidence on a material issue may be reversible error in a close case (*id.*, at § 354, pp. 357-358 and precedents cited), especially where it has deprived a party of a crucial theory that would have supported a verdict in its favor (*Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575, 588 [86 Cal.Rptr. 465, 468 P.2d 825]). All of these factors militate in favor of a finding of prejudice in this instance.

■ This was not a case in which the proffered evidence was merely cumulative of other evidence in the record. In opening argument, counsel for the University stated that Michael's parents' blood could not have been used in the operation because it was incompatible with his. However, the court conferred with counsel after the opening arguments and advised the jury that "there will be no evidence of the blood type of Mr. and Mrs. Osborn." Before the close of plaintiffs' case and outside the presence of the jury, the court again ruled that evidence associated with Michael's blood type would not be admitted. When Irwin attempted to ask its first witness whether 40 or 50 directed donors would necessarily be able to provide 12 units of blood for an operation, the court instructed the witness not to answer. A witness for the University, Dr. Stephen Cohen, later testified without objection that Michael had type A-negative blood and that this was "an unusual type." This testimony enabled Irwin's counsel to suggest to the jury that plaintiffs might not have been able to secure enough blood from directed donations to cover Michael's operation. He argued that "We don't know what would have happened to Michael Osborn if he had gotten a directed donation from one of those thirty-five people at the phone company, whether thirty-five would have been enough for his twelve units of what Dr. Cohen called rare blood."

Although this argument perhaps planted some doubt about the feasibility of directed donations in Michael's case, the jury was instructed that statements of counsel were not evidence, and they never learned that donations from Michael's family could not have been used, or that 35 directed donations from outside the family were likely to have been insufficient. The jury proceeded to deliberate for over three full days. During the course of their deliberations they asked to review various portions of the trial testimony, including the testimony of Irwin's receptionist and the statements attributed to her by Michael's father. After deliberating for more than two days, the jury sent a note to the court indicating that they had "reached an impasse. . . . Today we have taken our fourth vote and it remains at 7-5. We have considered the areas we feel are relevant, asked for testimony to be

reread and now find ourselves arguing the same points over and over without achieving any changes in opinion." The eventual verdict was split 9-3.

It appears that this was a close and difficult case for the jury, where an additional defense could have changed the result. The jury could well have been influenced by Michael's inability to receive any blood from family members, and the likelihood that he would have needed far more than 35 other directed donations. This evidence might have led the jury to conclude that the misrepresentation caused no harm because most of Michael's blood would have come from homologous donations in any event.

In light of Michael's rare blood type, Irwin submits that plaintiffs will be unable to show that denial of directed donations was likely to have caused any harm, and hence that Irwin is entitled to judgment on the negligent misrepresentation claim. (See *Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 403 [209 Cal.Rptr. 456] [no causal relation unless it is "more likely than not" that injury resulted from defendant's action]; *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 533 [126 Cal.Rptr. 681] [same].) Dr. Perkins's declaration in support of Irwin's motion for new trial states in pertinent part that "[o]nly 6% of the blood donor population has A negative blood. In order to obtain 12 units of A negative blood for their son, the Osborns would have needed to bring in approximately 200 designated donors. [¶] These people would also have to be suitable blood donors in terms of their own health. . . . From experience, we would expect 5% of the potential donor[s] to be rejected, requiring 10 more to replace them."

Irwin's briefs do not make the logic explicit, but presumably the argument is as follows: if some 210 donors would probably have been needed to obtain 12 units of type A-negative blood, then the 35 people who agreed to donate for Michael probably could have provided only 2 units of type A-negative blood; and if only 2 out of the 12 units of blood used in Michael's operation would have been different if there had been no misrepresentation, then the odds that the misrepresentation affected the outcome of Michael's case were less than 50-50 and plaintiffs cannot prove proximate cause. (See *Jones* v. *Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d at pp. 401-402 [affirming nonsuit where plaintiff's expert could not testify to a greater than "50-50 chance" that defendant's product contributed to development of disease].)

We do not have an adequate record to rule on this argument, or Irwin's related claim that proximate cause cannot be established because there were "unanticipated blood requirements" in connection with Michael's surgery. The argument that causation cannot be shown because of Michael's rare

blood type is premised on his receipt of 12 units of blood and the need for all of that blood to be type A-negative. Neither of these predicates is entirely clear from the record.

It is apparently agreed that the blood furnished to Michael came from 12 different donors. We infer this from Dr. Perkins affirmative response to the query by plaintiffs' counsel, "We know that there were twelve donors of blood to Michael Osborn, correct?" But it further appears that Michael may have received a total of 12 blood "components," rather than 12 whole units, and that not all of these "fractions" had to be type A-negative. We infer this from statements by defense counsel during their argument for the admission of evidence associated with Michael's blood type: "The Court: 'How many [units] did he actually get? [¶] Counsel for Irwin: 'Twelve units.' [¶] University Counsel: 'Not the whole units.' [¶] Counsel for Irwin: 'Twelve components. . . .' [¶] The Court: 'The units, they don't have to have the exact A negative.' [¶] University Counsel: 'It has to be A negative for that surgery. That is the first four units. After that four, for any whole blood it has to be A negative. For any fractions, there are some other compatibles.' "

The foregoing suggests that Irwin may have overstated its case for the relevance of Michael's rare blood type by implying, both at trial and on appeal, that over 200 directed donations would have been needed to find him sufficient compatible blood. On the other hand, we have found no indication in the record that 35 directed donations were likely to have been enough.

In these circumstances, we can do no more than conclude that Irwin should have been allowed to develop evidence tending to show that directed donations would not have been feasible in Michael's case. This evidence was relevant to the issue of proximate cause and we deem it sufficiently material to require a new trial. Whether it justifies a nonsuit will be for the trial court to determine after the evidence is in. (Cf. *Julrik Productions, Inc.* v. *Chester* (1974) 38 Cal.App.3d 807, 812 [113 Cal.Rptr. 527] [appellate court declines to engage in factfinding process with respect to erroneously excluded evidence].) It is difficult for us to see how evidence relating to Michael's blood type could be conclusive in Irwin's favor, because plaintiffs can always argue that they could have found more directed donors if they had to. (Cf. Rest.2d Torts, § 434, subd. (2)(a) [proximate cause is jury question unless jury could not reasonably differ on whether defendant's conduct was substantial factor in causing harm].)

We also have no way of properly evaluating the claim that plaintiffs cannot establish proximate causation because there was an "unanticipated" need for extra blood in connection with Michael's surgery. Irwin asserts that:

"it may reasonably be presumed" that any directed donations would only have covered the blood Michael needed "during" surgery; the University's medical records disclose that eight of the twelve units or components of blood Michael received were administered postoperatively; this indicates that Michael had an "unforseen" need for blood; and this unforeseen need would have been met with blood from Irwin's regular donor pool. Irwin also maintains that it was "effectively precluded" from making this argument at trial.

Irwin may have been dissuaded from making this argument by the rulings on evidence associated with Michael's blood type, but the argument in any event was never made, and no evidence to support it was ever developed. Insofar as it appears from the testimony on Michael's operation, the procedure went smoothly and was a complete success. We therefore do not know whether there was in fact any "unforeseen" need for blood in his case. This point, if valid, again appears relevant but not conclusive.

A new trial on the claim of negligent misrepresentation is required.

### III. CLAIM OF NEGLIGENCE AGAINST IRWIN

#### A. *Standard of Review*

Most of the evidence at trial concerned the actions Irwin took, or allegedly should have taken, to safeguard its blood supply in early 1983 in light of concerns at the time that AIDS might be transmissible by blood. ██ ██ The issue on appeal is whether, in light of that evidence, Irwin was entitled to judgment notwithstanding the verdict on plaintiffs' claim of negligence.[3]

 Well-settled standards govern judgments notwithstanding the verdict: "When presented with a motion for JNOV, the trial court cannot weigh

---

[3]Plaintiffs come very close to waiving this issue for lack of a legal argument. (See generally 9 Witkin, Cal. Procedure, *op. cit. supra*, Appeal, § 479, pp. 469-471 [points not supported by legal argument with citation of authorities may be treated as waived].) Plaintiffs do no more than allude to the substantial evidence rule, and suggest in passing that judgment notwithstanding the verdict may have been unwarranted. We deem the point to be preserved as to negligence only because plaintiffs refer to some of the evidence on that claim in some detail. No evidence is singled out on the claim of intentional misrepresentation, and we find any error associated with judgment for Irwin on that cause of action to be abandoned. We also note that plaintiffs do not contest the directed verdict for Irwin on their other causes of action.

Irwin's briefs assert that "where the jury renders a general verdict on multiple counts and there is insufficient evidence or a legal error that affects any one of the counts, a new trial is required on *all* counts to prevent a miscarriage of justice." If that were true, then having found reversible error in connection with the negligent misrepresentation count, we would also be obliged to order a retrial on negligence without reaching the sufficiency of the evidence on that count. However, because a general verdict must be affirmed if there was any sufficient finding on which it could rest (see, e.g., *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 157 [65

the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied. [Citation.] (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].) The same standard of review applies to the appellate court in reviewing the trial court's granting of the motion. (*Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 515 [143 Cal.Rptr. 247, 573 P.2d 465]; *Hauter, supra,* at p. 111.) Accordingly, the evidence . . . must be viewed in the light most favorable to the jury's verdict, resolving all conflicts and drawing all inferences in favor of that verdict." (*Wright* v. *City of Los Angeles* (1990) 219 Cal.App.3d 318, 343 [268 Cal.Rptr. 309], parallel citations and internal quotation marks omitted.)

## B. *Evidence*

### (1) *Concerns About AIDS and the Blood Supply in Early 1983*

Plaintiffs based their claim of negligence on Irwin's acts and omissions in January and February of 1983. Although the donor whose blood infected Michael was not identified, there was testimony that red blood cells have a shelf life of only 35 days, and the jury could infer that the blood in question was collected sometime during these two months. To put Irwin's procedures in proper perspective, it is necessary to outline the evidence on what was known about AIDS in early 1983, and the steps taken by blood banking organizations and regulators in light of that knowledge.[4]

The first cases in the United States of what later became known as AIDS were reported in 1981. Most of the early cases involved male homosexuals, intravenous drug users or Haitian immigrants. In July of 1982, the Centers

---

Cal.Rptr. 406, 28 A.L.R.3d 368]; see generally 9 Witkin, Cal. Procedure, *op. cit. supra*, Appeal, § 268, p. 277), error on the claim of negligent misrepresentation does not dictate a new trial if a verdict on negligence can be upheld.

[4]Useful overviews of this subject are set forth in *Kirkendall* v. *Harbor Ins. Co.* (W.D.Ark. 1988) 698 F.Supp. 768, 770-772, affirmed (8th Cir. 1989) 887 F.2d 857; and *Kozup* v. *Georgetown University* (D.D.C. 1987) 663 F.Supp. 1048, 1051-1053, affirmed in relevant part in *Kozup* v. *Georgetown University* (D.C. Cir. 1988) 851 F.2d 437 [271 App.D.C. 172], but we are of course confined to the evidence adduced in this case in assessing the judgment notwithstanding the verdict.

for Disease Control (CDC) reported that three heterosexual hemophiliacs, who were neither intravenous drug users nor Haitian immigrants, had contracted pneumocystis carinii pneumonia, an opportunistic infection associated with AIDS. This report suggested that AIDS might be transmissible by blood because these patients had received frequent injections of the blood product Factor VIII. However, Dr. Louis Aledort, who was then medical director of the National Hemophilia Foundation, testified that the report was discussed at an international conference on hemophilia shortly after its release and found to be inconclusive. According to Dr. Aledort and Dr. Paul Volberding, who began treating AIDS patients at San Francisco General Hospital in 1981, it was debated whether these cases involved an infectious agent in the blood, or suppression of the immune system from the chronic transfusions of concentrated blood proteins received by hemophiliacs.

In December of 1982, the CDC published a report by Dr. Perkins and others of a case of "possible transfusion-associated" AIDS. The case involved a 20-month old infant in the San Francisco area with symptoms resembling those seen among adults with AIDS. The infant received multiple transfusions shortly after birth, including platelets from a man who appeared to be in good health when he donated blood, but who began exhibiting symptoms associated with AIDS eight months later. The "editorial note" to this report, with footnotes omitted, states: "The etiology of AIDS remains unknown, but its reported occurrence among homosexual men, intravenous drug abusers, and persons with hemophilia A suggests it may be caused by an infectious agent transmitted sexually or through exposure to blood or blood products. If the infant's illness described in this report is AIDS, its occurrence following receipt of blood products from a known AIDS case adds support to the infectious-agent hypothesis. [¶] If the platelet transfusion contained an etiologic agent for AIDS, one must assume that the agent can be present in the blood of a donor before onset of symptomatic illness and that the incubation period for such illness can be relatively long. . . . [¶] This report and continuing reports of AIDS among persons with hemophilia A raise serious questions about the possible transmission of AIDS through blood and blood products."

These concerns led the CDC to convene a meeting on January 4, 1983. According to the invitation, the purpose of the meeting was "to formulate recommendations for the prevention of AIDS with special emphasis on possible transmission through blood and blood products." The meeting was attended by 80 to 100 people, including representatives of all of the major blood banking associations, the Food and Drug Administration (FDA), the National Gay Task Force and the news media. ██ ██ Three of those in attendance, Dr. Perkins, Dr. Aledort, and John Hink of Cutter

Laboratories, testified at trial.[5] Dr. Perkins said that "the meeting degenerated into a series of discussions that indicated that nobody was in agreement as to what should be done." Hink came to essentially the same conclusion in a memo two days after the meeting, in which he wrote that the "anti-discrimination position of the gays, self-serving comments of blood bankers and lack of data to provide legitimacy to many proposals resulted in an overall stalemate."

The cause of AIDS was unknown and there was no test for it at the time, but the CDC presented data on the results of various surrogate tests, performed on the blood of a limited population of people who exhibited symptoms of AIDS, which might be used to determine whether a donor was at high risk for the disease. The CDC estimated that only 5 percent of normal controls would be positive in anti-HBc tests for the antibody to the hepatitis B core antigen. However, all 21 of the intravenous drug users in the CDC's test group, and 88.2 percent of the 93 homosexuals or bisexuals in the group, tested positive for this antibody. Hink wrote in his memorandum that an "ever recurring" proposal at the meeting was to conduct anti-HBc tests and reject all blood that tested positive. Hink noted that the cost of the test "bothered many but not CDC." Dr. Aledort testified that "there was a great deal of beseeching and questioning and saying would somebody out there at least try and look at it." Dr. Perkins wrote in a January 9, 1983, memorandum that although "doubt was expressed that the test would select a high risk group for AIDS. . . . [f]urther experimental studies are clearly warranted."

The other "ever recurring" proposal at the CDC meeting, according to Hink, was to "[c]onduct an educational campaign on the subject [of AIDS] to all homosexual populations and allow them to voluntarily exclude themselves as blood and plasma donors." Hink described gay rights advocates as "definitely in favor" of AIDS education, but "greatly opposed" to exclusion of gays as donors. In his January 9 memo, Dr. Perkins wrote that "[t]he issue of rejecting prospective donors simply because they come from a high risk group was even more controversial" than surrogate testing. Perkins reported that "There was almost complete agreement that any policy which excluded all gay male donors was irrational, unscientific, unwise, and could jeopardize the nation's blood supply. . . . Some at the meeting obviously thought that working through leaders and physicians of the gay groups, it should be

---

[5]Our account of what transpired at the meeting is based solely on the evidence presented in this case. We decline plaintiffs' request to take judicial notice of the account of the meeting in Shilts, And the Band Played On (1987) at pages 220-224. Contrary to plaintiffs' suggestions, this reporter's account is not admissible under the "historical works" exception to the hearsay rule (Evid. Code, § 1341; see *Gallagher* v. *Market St. R. Co.* (1885) 67 Cal. 13, 15-16 [6 P. 869] [exception is generally confined to "ancient facts" and does not extend to work of living author within reach of court process]), nor is it limited to facts "not reasonably subject to dispute" that may be judicially noticed under Evidence Code section 452, subdivision (h).

possible to obtain voluntary restriction of donation by those male gays who fit the AIDS stereotype (very large numbers of sexual partners, indiscriminately chosen). No one thought this should be mandatory . . . ."

On January 6, 1983, a committee of the American Association of Blood Banks (AABB) called a meeting to review what a witness at trial described as "the status of what blood banks could and should be doing" in light of the possibility that blood could transmit AIDS. The meeting was attended by representatives of the American Red Cross (ARC), the Council of Community Blood Centers (CCBC), and many of the other groups that had attended the CDC meeting two days earlier. On January 13, 1983, the AABB, ARC and CCBC issued a "Joint Statement on Acquired Immune Deficiency Syndrome (AIDS) Related to Transfusion," which, according to a physician who participated in the January 6 meeting, represented the "[c]ollective . . . agreement by those responsible for provision of blood transfusions in the United States."[6]

The statement noted that less than 10 of the more than 800 AIDS cases then reported were possibly linked to blood transfusions, that approximately 10 million transfusions occur annually, and that evidence of transfusions transmitting AIDS was "inconclusive." The blood banking associations nevertheless believed that they "must respond to the possibility that a new and infectious illness has surfaced." They recommended that prospective donors be asked about AIDS-related symptoms, including "night sweats, unexplained fevers, unexpected weight loss, lymphadenopathy or Kaposi's sarcoma," and that all positive or suggestive answers "be evaluated before anyone donates." They also recommended that blood drives not target "groups that may have a high incidence of AIDS." They felt, however, that it was "inappropriate" to ask prospective donors about their sexual preference, and they did not advise "routine implementation of any laboratory screening program for AIDS," such as anti-HBc testing.

No other AIDS-related recommendations were made by these blood banking groups, and no AIDS-related guidelines were issued by the government, until March of 1983, after Michael's operation.

On March 4, 1983, the Public Health Service issued a statement on AIDS prevention. The statement noted that the distribution of AIDS cases paralleled that of hepatitis B, and that the incidence of AIDS in hemophilia patients, intravenous drug abusers, and transfusion recipients suggested that

---

[6]The AABB has advised us in an amicus curiae letter that its members provide approximately one-half of the blood transfused in the United States, and that the ARC provides the rest.

AIDS was transmissible by blood. The statement observed that interested groups, including the American Association of Physicians for Human Rights and the National Gay Task Force, as well as the AABB, ARC and CCBC, had not agreed on the steps that should be taken to reduce this "potential risk" of AIDS transmission. The statement recommended that persons in high-risk groups refrain from donating blood, and it advised blood collection centers to inform potential donors of that recommendation. It also advised that studies be done to evaluate screening procedures, such as "laboratory tests as well as careful histories and physical examinations," that might identify blood with a high probability of transmitting AIDS.

The FDA issued recommendations on March 24, 1983. The FDA indicated that "[t]he major organizations engaged in blood collection have recently reached a consensus as to steps which should be taken to decrease the risk of transmitting AIDS by blood transfusion," and it stated that its recommendations were consistent with those of the AABB, ARC and CCBC. The recommendations called for blood banks to: inform people at increased risk of AIDS to refrain from donating; instruct their personnel on the use of questions to detect AIDS symptoms or exposure to those with AIDS; and establish procedures for handling of blood collected from donors suspected of having AIDS. On April 4, 1983, the AABB specified standard operating procedures in accordance with the FDA recommendations. The AABB disseminated FDA-approved literature to be given to prospective donors and listed AIDS-related symptoms to be elicited by donor screening.

### (2) Irwin's Actions

Plaintiffs' principal theory of negligence is that Irwin should have started anti-HBc surrogate testing for AIDS prior to Michael's operation. ██ ██ Plaintiffs also argue that Irwin's practices with respect to donor questioning were negligent.[7] The evidence of Irwin's actions in these areas was as follows.

### (a) Anti-HBc Testing

Dr. Perkins testified that Irwin acted on the assumption that AIDS could be transmitted by blood from the time of the December 1982 report of the

---

[7]Although plaintiffs submit that Irwin was negligent in other respects, they refer to little or no evidence for those other theories and we find them to be abandoned for purposes of this appeal. (See 9 Witkin, Cal. Procedure, op. cit. supra, Appeal, § 479, pp. 469-471 [reviewing court is not required to make unassisted study of record in search of error].) Stating that there was "clearly a plethora of substantial evidence" to support the verdict does not substitute for identification of the actions that should or should not have been taken and citation of evidence that those acts or omissions were negligent.

infant who appeared to have contracted AIDS from a transfusion. Perkins noted that the anti-HBc test results reported by the CDC at the January 4 meeting were inconclusive because they were performed on people who exhibited symptoms of AIDS, and there was no data on "whether people who appeared to be healthy and were carrying this presumed virus" would test positive. He explained that the real need was for a test that would eliminate the asymptomatic donors, because routine medical screening would identify people with full-blown AIDS like those in the CDC's test group. However, he "went home [from the CDC meeting] with a message that we ought to look into those tests and see if they would be useful." Two days after the CDC meeting, Perkins wrote a memorandum to Irwin's executive director and others outlining some of the difficulties he foresaw in evaluating surrogate tests for AIDS. His preliminary conclusion was "essentially that we will not learn anything."

Dr. Marcus Conant invited Perkins to a meeting at the University on January 20, 1983, to discuss transfusion-associated AIDS. Conant estimated that 50 physicians attended the meeting, and he recalled that there was a split of opinion among them on the utility of surrogate testing. On that issue, Conant's impressions were that "Dr. Perkins at that time did not feel that they had many high risk donors going to Irwin," or that "the problem was as acute as I and others felt it was." Conant said Perkins also expressed "concern about the cost of doing the [anti-HBc] test," which was stated at the meeting to be $5. Perkins testified he "thought we were all in agreement" when the meeting concluded, but it later appeared "they misunderstood what I was saying."

According to a telephone message, Conant called Perkins on January 28 to inform him "that a group of physicians from UCSF are planning to make a public statement next week concerning their demand that all blood be tested for hepatitis B core antibody." On that date, Conant and Dr. David Altman circulated to other physicians the text of the proposed statement for their review and comment. The memo began: "Concern has been expressed that additional steps should be taken to screen blood at the Irwin Memorial Blood Bank that is being donated by gay men in San Francisco. To date no public group has made a statement about using hepatitis B core antibody as a screen. . . ." Perkins called Conant back on January 31 and told Conant that he "could understand the arguments which led to such a statement but was not ready to agree with it." Perkin's memo on the conversation noted that the proposed statement "failed to list the pros and cons of testing. I pointed out that the CDC data showed that 12% of known AIDS cases had neg[ative] tests for anti-HBc, and that the frequency could be much greater in the incubation phase. [¶] I pointed out that we would permanently lose 5% of

our donors, and that many of these would be driven to hysterics no matter how we reassured them."

On February 2, Conant, Altman and four other University physicians issued a press release stating: "It seems likely that the acquired immunodeficiency syndrome, AIDS, is caused by an infectious agent that is transmitted through sexual contact and/or blood or blood products, but neither the agent (or agents) nor the exact mode of transmission has been identified. Because of the strong possibility of an infectious agent being involved, the Centers for Disease Control has issued guidelines for medical personnel to follow in handling AIDS-related material . . . . [¶] Although a serologic marker for AIDS is not yet available, two facts compel us to recommend th[e] following screening test: First, AIDS seems to be transmitted in a manner parallel to that of hepatitis B virus; second, in patients with AIDS there is a very high incidence of the antibody to the hepatitis B core antigen, anti-HBc, a very sensitive marker for hepatitis B virus infection. This test is now readily available to clinicians and laboratories. [¶] We are recommending that the Irwin Memorial Blood Bank and other blood banks in New York and Los Angeles, where there is a high incidence of AIDS, investigate the feasibility of screening all donated blood for anti-HBc. . . ."

Four of the six physicians who signed this press release testified at trial. They all said that the release was not intended as a directive to Irwin to immediately begin anti-HBc testing, but rather to do a study of its feasibility. Advocates of anti-Hbc testing at this time included Bay Area Physicians for Human Rights (BAPHRA), an organization of health care providers dedicated to promoting the health concerns of lesbians and gays. Dr. Perkins testified that Irwin personnel met frequently with members of BAPHRA beginning in December of 1982. He said BAPHRA advocated surrogate testing in lieu of excluding donors on the basis of sexual preference because "[t]hey wanted something that would not stigmatize gays."

Perkins indicated that Irwin had begun "moving to set up surrogate tests for evaluation purposes" in January of 1983. For various reasons, however, a protocol for meaningful testing could not be set up within a matter of weeks: "You have to decide what you are going to do, and that means consulting a lot of experts. You have to decide how you are going to do it. You have to make plans for what you will need, and you have to find out if the supplies will be available and you have to get them in. And then you have to begin to train your people on the procedures needed to do the test." Perkins explained that, because of the high volume of samples that needed to be processed, Irwin could not simply hire trained people to begin testing immediately. Dr. Aledort estimated that it would take several months to set up the test.

Perkins said that Irwin had only a small amount of supplies for anti-HBc testing in early February. He told hospital representatives at a meeting on February 8 that Irwin was "embarking on a study" of the test. Perkins ordered 10,000 anti-HBc testing kits on February 10. According to his memo on that date, testing would begin as soon as the kits arrived, and 10,000 tests would be completed before Irwin decided "whether to make the test part of our routine." Irwin did not begin its trial of anti-HBc testing until March of 1983, after Michael's operation.[8]

(b) *Donor Questioning*

On January 7, 1983, after returning from the CDC meeting, Dr. Perkins circulated a memo to Irwin personnel to immediately add three AIDS-related questions to the medical histories of prospective donors. These questions asked whether donors: had ever resided in Haiti; had problems with swollen lymph nodes in the last two years; or had unexplained fevers. Perkins estimated that Irwin collected 2,000-3,000 units of blood between January 7 and January 19, 1983, when it began asking additional questions about AIDS-related symptoms in accordance with the January 13 statement by the AABB, ARC and CCBC.

On February 8, 1983, Irwin began asking prospective donors whether they had had multiple sex partners who were intravenous drug users, Haitian immigrants, or homosexually active males. Perkins testified that Irwin worked with community leaders after the first report of possible transfusion-associated AIDS in December to get the message out that gays who had had large numbers of anonymous sexual partners should not donate blood. He said that the evidence at the CDC meeting was that only so-called "fast lane" gays were getting AIDS. By the end of January, however, cases of AIDS were appearing among gays who had not had numerous anonymous sex partners. This led Irwin to begin excluding gays as donors unless they had been celibate or monogamous for the period of time AIDS was believed to incubate. Perkins estimated that Irwin collected 8,000-10,000 units of blood between January 1 and February 8, 1983, when it began asking about sexual

---

[8]Irwin advised the court in a pretrial motion that: "Following an efficacy study in March through May 1983 on the efficacy of anti-HBc testing as a surrogate test for AIDS, Irwin rejected its use. By May 1, 1984, despite the fact that there was no new scientific data showing that anti-HBc testing was effective at screening out AIDS carriers, Irwin decided to use the test on all of its donated blood in order to *do something* in light of its discovery that some high-risk donors, primarily homosexuals, were lying about their sexual orientation and continuing to donate blood." The court evidently granted Irwin's motion *in limine* to exclude any mention of this subsequent remedial measure, and the jury was never advised of it. (See Evid. Code, § 1151 [evidence of subsequent remedial measures inadmissible to prove negligence].)

orientation. The language Irwin developed in this area "became common nomenclature throughout blood banking."

It does not appear that Irwin's donor questioning changed again before Michael's operation. Between February 8 and April 7, 1983, nurses noted on donor medical history cards that all of Irwin's AIDS-related questions had been asked. On April 7, the questions were incorporated into a new donor card. Perkins said that Irwin deferred printing the new cards pending the expected release of FDA recommendations in March. Questions on the new card covered all topics specified in the FDA's March 24 recommendations and the AABB's April 4 standard operating procedures for donor screening.[9]

Perkins indicated that Irwin allowed adult and repeat donors to fill out their own cards to save time and encourage candid responses. The card that went into use on April 7 contained signature lines for the donor and a medical historian. It asked the donor to aver that "The medical history I have given is true and accurate to the best of my knowledge." Perkins said that people would often deny being gay or bisexual, and that was "why we didn't ask that question point blank."

The evidence includes a letter written by Cutter's John Hink to a physician at a plasma center on February 14, 1983, stating: ". . . You may have read about the Amer. Assn. of Blood Banks' (and in particular the Irwin Memorial Blood Bank of San Francisco) reluctance to screen homosexual donors. They were concerned about the potential reduction in availability of whole blood (and possibly discrimination) but have given in to the tremendous pressure from the public and regulatory authorities. . . ."

(3) *Expert Opinions*

To assess the judgment notwithstanding the verdict, we must focus on the qualifications and testimony of plaintiffs' experts: Dr. Thomas Asher; Dr. William O'Connor; and Dr. J. Garrott Allen.

Dr. Asher received a Ph.D. in microbiology from the University of London in 1950. He worked six years for the CDC, then known as the Communicable Disease Center, where his duties included investigation of hepatitis

---

[9] The card covered AIDS-related subjects as follows: "AIDS, a new disease of unknown cause, is characterized by abnormal functioning of the body's immune system. High risk groups for AIDS include: [¶] • Intravenous drug users [¶] • Haitian immigrants [¶] • Homosexually active males [¶] To assist in deferral of prospective donors who may be at high risk for AIDS, please indicate whether any of these conditions apply or have applied to you by answering yes or no below: [¶] • Residency in Haiti • Recurring fever over a long period of time • Heavy nightsweats • Unexpected weight loss of 10 lbs or more in a short time • Enlargement of glands throughout body • Kaposi's Sarcoma • Intimate contact with an AIDS patient • Multiple sex partners from any of the high risk groups listed above."

epidemics and disease diagnosis based on immune response. He worked eight years for Highland Laboratories, a large manufacturer of plasma products, which at the time had a whole blood bank. Asher became Highland's director of quality assurance, and monitored "how efficiently we were running a whole blood bank equivalent to the type of blood banks" in this case. He then formed his own plasma products business, sold it, and started a second company, HemaCare Corporation, a commercial supplier of specialized blood products. Asher testified that about half of HemaCare's activities could be considered a "very sophisticated form of blood banking." He was on the board of directors of the American Blood Resources Association (ABRA), the trade association for the plasma sector of the blood industry, in 1982 and 1983. He addressed the Presidential Commission on the HIV Epidemic in the spring of 1988.

Asher testified that he had studied literature on the subject of AIDS and the results of others' AIDS research. He said he first suspected AIDS was transmissible by blood "in mid 1982." It was "very obvious" to him in early 1982 that AIDS had a similar epidemiology to hepatitis B, which was known to be an infectious disease that could be passed through blood. He described the July 1982 report of AIDS in hemophilia patients as "the smoking gun" that showed blood could transmit AIDS. Asher said that he had reviewed the evidence of Irwin's actions in January and February of 1983 in response to concerns about AIDS. Based on that evidence, and his training and experience in the blood industry, Asher opined that Irwin's actions were "insufficient and inadequate. [¶] I feel that they failed to, to do certain things that other people knew of and that they should have done, that a prudent person would have done."

Asher said that surrogate testing was economically feasible at the time, and in his view it made more "sense to perform surrogate testing and lose a percentage of donors than it did to take a chance of killing people or infecting people." His company did not institute anti-HBc testing after the January 4 CDC meeting. However, it began taking total lymphocyte counts, another form of surrogate testing discussed at the meeting, and it rejected donors who fell below a certain count on this test. Asher's company also "became much more thorough" in its medical history screening during this period. It started asking donors whether they were intravenous drug users or practicing homosexuals, and it required donors to attest that they were not in any of the groups at increased risk of AIDS.

Asher opined that the questions Irwin first asked upon Perkins's return from the CDC meeting, which covered only Haitian residence, swollen lymph nodes and night sweats, were "inadequate" in light of the data then

available. Asher thought that there "should have been more questioning covering all of the symptoms associated with AIDS, not these three criteria." Asher further opined that the questioning on Irwin's April 1983 donor card was inadequate. He said that donors could not have been expected to accurately interpret the card's abbreviated sentences about AIDS. He also thought that Irwin should have asked its donors to attest to the best of their knowledge that they were not at risk for the disease.

Asher indicated that such an attestation was required by every company in the plasma sector of the blood industry "by sometime at the end of February or at the latest in March" of 1983. He also said he knew of a plasma company that was "doing a survey" of anti-HBc testing in "Late '82, early '83." Asher admitted he knew of no blood bank that took lymphocyte counts or performed anti-HBc tests for AIDS in February of 1983. However, he maintained that all blood banks were "very slow to respond" to the AIDS problem because they are "geographic monopolies" that do not have to compete "in their predesigned boundaries" with other blood suppliers.[10]

Dr. O'Connor graduated from medical school in 1981 and worked as a family practice physician. He became convinced that blood could transmit AIDS in July of 1982, when cases of the disease were reported in hemophilia patients. He testified that he "had a very deep concern about this epidemic from pretty much its onset," and had "developed over the years an expertise" on the subject "that is not only recognized by myself but persons with the field." He said "the majority of researchers by mid to late 1982 accepted that [AIDS] was a transmissible agent and most probably a virus." O'Connor was "critical" of Irwin for failing to institute anti-HBc testing after receiving the data presented at the January 4 CDC meeting.

On cross-examination, O'Connor acknowledged that he had never worked as a blood banker, and that he had never published an article on AIDS in any medical journal. He admitted that as of February 1983 no medical journal had reported that AIDS was caused by a virus. He conceded that the CDC's data in January of 1983 did not indicate how many asymptomatic people with AIDS would test anti-HBc positive. He could not identify any blood bank that conducted anti-HBc surrogate testing for AIDS in February of

---

[10]We decline plaintiffs' request to take judicial notice of a statement in the June 1988 Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic that the "initial response of the nation's blood banking industry to the possibility of contamination of the nation's blood by a new infectious agent was unnecessarily slow." This report was not presented to the trial court and is not a matter of which we are required to take judicial notice. (See *People* v. *Preslie* (1977) 70 Cal.App.3d 486, 493 [138 Cal.Rptr. 828].) The commission's statement is in any event cumulative of Dr. Asher's testimony.

1983. O'Connor noted that John Hink's memorandum on the CDC meeting said someone there named Fetzer "was going to go back and do hepatitis B core testing at his shop," but O'Connor did not know who Fetzer was or whether he worked at a blood bank.

Dr. J. Garrott Allen received his medical degree in 1938. He set up the blood bank at the University of Chicago clinics in 1941 and ran it for 18 years before leaving to head the department of surgery at Stanford Medical School. He wrote a textbook in 1972 on the epidemiology of posttransfusion hepatitis, and he authored numerous articles between 1944 and 1987 on blood diseases, blood transfusion, blood products and blood banking. Allen indicated that he had disagreements with the blood industry on various matters throughout his career, and that he had been critical of Irwin for 20 years. Allen opined that Irwin should have commenced surrogate testing in light of the evidence presented at the CDC meeting.

The background and testimony of Irwin's experts may be summarized more briefly. Dr. Paul Holland was chief of the blood bank at the National Institutes of Health for 20 years through September of 1983. Holland helped author the January 13, 1983, AABB statement that recommended against surrogate tests for AIDS or sexual preference questioning of prospective donors. He opined that the standard of care for blood banks in January and February of 1983 did not require surrogate testing. His investigations had revealed no blood bank performing surrogate tests at that time, and he said that Irwin was "way ahead of everybody else" when it made arrangements in February of 1983 to conduct a study of anti-HBc testing. In his opinion, it would have been "very inappropriate" for Irwin to begin routine anti-HBc testing before studying whether it would work.

Dr. Steven Kleinman had worked for the ARC in Orange County, California since July of 1982, spoken widely on the subject of AIDS and the blood supply, and written numerous articles on blood banking and transfusion-related diseases, including AIDS. He was asked whether, in light of its arrangements for surrogate testing and donor questioning, Irwin was doing "what a reasonably prudent and careful blood bank should have done" as of February 15, 1983, to combat the spread of AIDS. He opined that Irwin was acting "very responsibly" and doing more in those areas than any other blood bank. He said that the ARC also began asking AIDS-related questions in February of 1983.

Dr. Harold Oberman was a professor at the University of Michigan and director of the blood bank at its medical center, past president of the Michigan Association of Blood Banks, and author of over 100 scientific

articles in the fields of pathology and blood banking. Oberman opined that Irwin's donor questioning in mid-February 1983 represented what a reasonably prudent blood bank should have been doing at the time to eliminate those at high risk for AIDS. He also said that Irwin was doing more than any other blood bank in the country in the areas of donor questioning and anti-HBc testing.

### C. *Form of Plaintiffs' Expert Testimony*

The form of their experts' testimony suggests that plaintiffs assumed their case against Irwin was one of ordinary negligence. Plaintiffs' experts did not couch their opinions in terms of the standard of care for blood banks in early 1983. They simply said what Irwin "should" have done, or what a "reasonable person" would have done, in light of what was known about AIDS at the time. We ultimately conclude that this distinction is one of substance as well as form, but the threshold question is whether Irwin should be held to a professional standard of care.

We note that this appears to be a point of first impression in California. The precedents indicating that blood banks are not subject to strict liability for providing contaminated blood (see Health & Saf. Code, § 1606 [distribution of blood is a service rather than a sale]) have observed that blood banks may be sued for negligence but have not undertaken to define the standard of care. (See *McDonald* v. *Sacramento Medical Foundation Blood Bank* (1976) 62 Cal.App.3d 866, 872 [133 Cal.Rptr. 444]; *Klaus* v. *Alameda-Contra Costa Medical Assn. Blood Bank, Inc.* (1976) 62 Cal.App.3d 417, 419 [133 Cal.Rptr. 92].) ▇▇▇ We have determined that Irwin is a "health care provider" within the meaning of MICRA (*Coe* v. *Superior Court* (1990) 220 Cal.App.3d 48, 53 [269 Cal.Rptr. 368]), and there is no question that donor screening and blood testing are "professional services" for purposes of MICRA (see Civ. Code, §§ 3333.1, subd. (c)(2), 3333.2, subd. (c)(2); and Code Civ. Proc., § 667.7, subd. (e)(4) [defining "professional negligence" in pertinent part as "a negligent act or omission to act by a health care provider in the rendering of professional services"].) However, MICRA's damage limitations do not purport to define the standard of care.

▇▇▇ We conclude that the adequacy of a blood bank's actions to prevent the contamination of blood is a question of professional negligence and fulfillment of a professional standard of care. As another court has observed, the "activities of [the blood bank] at issue here—the collection, processing, and testing of blood for transfusion—no doubt require the exercise of professional expertise and professional judgment." (*Doe* v. *American Red Cross Blood Services, S.C. Region* (D.S.C. 1989) 125 F.R.D. 637, 642.)

This conclusion is consistent with most of the cases in other jurisdictions that have considered negligence claims against blood banks. (See *Doe* v. *American Red Cross Blood Services* (1989) 297 S.C. 430 [377 S.E.2d 323, 326]; *Kirkendall* v. *Harbor Ins. Co.*, *supra*, 698 F.Supp. at p. 778; *Kozup* v. *Georgetown University*, *supra*, 663 F.Supp. at p. 1057; *Tufaro* v. *Methodist Hospital, Inc.* (La.Ct.App. 1979) 368 So.2d 1219, 1221; *Hines* v. *St. Joseph's Hospital* (App. 1974) 86 N.M. 763 [527 P.2d 1075, 1078]; *Hutchins* v. *Blood Services of Montana* (1973) 161 Mont. 359 [506 P.2d 449, 452-453]; see also Comment (1989) 41 S.C.L.Rev. 107, 114 ["most courts only hold blood banks to a 'professional' rather than a 'reasonable man' standard of care"].) This conclusion is also consistent with California cases that have applied a professional standard to activities involving special training and skill. (See, e.g., *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 408 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324] [physicians]; *Fraijo* v. *Hartland Hospital* (1979) 99 Cal.App.3d 331, 342 [160 Cal.Rptr. 246] [nurses]; *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187-189 [98 Cal.Rptr. 837, 491 P.2d 421] [lawyers].)

Irwin was therefore required to exercise with respect to blood testing and donor screening "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised" by other blood banks "under similar circumstances." (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 36 [210 Cal.Rptr. 762, 694 P.2d 1134] [medical malpractice]; *Landeros* v. *Flood*, *supra*, 17 Cal.3d at p. 408 [same].) Although this same standard of care applies generally to "[t]hose undertaking to render expert services in the practice of a profession or trade" (*Estate of Beach* (1975) 15 Cal.3d 623, 635 [125 Cal.Rptr. 570, 542 P.2d 994]), we will refer to authorities in the area of medical malpractice because blood banking has appropriately been treated as a medical service. (See *Doe* v. *American Red Cross Blood Services*, *supra*, 377 S.E.2d at p. 326 [collection and processing of blood for transfusion is a "medical service"]; *Tufaro* v. *Methodist Hospital, Inc.*, *supra*, 368 So.2d at p. 1221 [standard of care for physicians and surgeons applies to collection and transfusion of blood]; *Hutchins* v. *Blood Services of Montana*, *supra*, 506 P.2d at pp. 452-453; Cal. Code Regs., tit. 17, § 998, subd. (b) [director of blood bank must be licensed as physician and surgeon]; 21 C.F.R. § 640.3(a) [suitability of blood donor shall be determined by or under supervision of qualified physician]; and cf. *Coe* v. *Superior Court*, *supra*, 220 Cal.App.3d at p. 53 [blood banks' activities are "inextricably identified with the health of humans"].)

A "blood bank" is defined in Health and Safety Code section 1600.2 as "any place where human whole blood, and human whole blood derivatives specified by regulation, are collected, prepared, tested, processed, or stored,

or from which human whole blood or human whole blood derivatives specified by regulation are distributed." (Cf. Health & Saf. Code, § 1603.1, subd. (i) [defining "plasma center"].) Irwin argued at trial in connection with the testimony of Dr. Asher that it should only be judged with reference to other "*non-profit* blood centers that collect from *volunteer* donors whole blood that is used, on a unit-by-unit basis, for transfusion purposes."[11] It could be argued that the only blood banks in "similar circumstances" to those of Irwin in January and February of 1983 were those in other cities known to have a relatively high incidence of AIDS. It could also be argued that AIDS posed essentially the same risk for every blood bank and blood supplier in the nation. None of these arguments with respect to the standard of care is developed on appeal. For purposes of this opinion, we will assume that Irwin was similarly situated to all blood banks fitting California's statutory definition.

Irwin does not challenge the form of plaintiffs' expert opinions. Aside from the expert testimony, all of the evidence on negligence related to knowledge about AIDS in early 1983 and actions of blood banks in light of that knowledge. In the context of that evidence, it can be inferred that plaintiffs' experts were opining on what the standard of care for blood banks required. (See *Wright* v. *City of Los Angeles, supra*, 219 Cal.App.3d at p. 343 [party who secured verdict entitled to every favorable inference on appeal from judgment notwithstanding the verdict]; and cf. *Tomei* v. *Henning* (1967) 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633] [expert opinion on negligence "need not be in any particular language"].)

D. *Qualifications of Plaintiffs' Experts*

Irwin contends that the court erred in allowing plaintiffs' experts to testify because they were not qualified to opine on the issue of Irwin's negligence. This argument is potentially dispositive. ▮ The standard of care in a professional negligence case " '. . . is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman.' [Citations.]" (*Landeros* v. *Flood, supra*, 17 Cal.3d at p. 410; see also *Estate of Beach, supra*, 15 Cal.3d at p. 635.) Steps that should have been taken to safeguard the blood supply in early 1983 are not matters of "common knowledge." Plaintiffs thus needed opinions from qualified experts to establish a prima facie case. (See *Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 844 [206 Cal.Rptr. 136, 686 P.2d 656].)

---

[11] Asher's testimony on this score was somewhat confused. He first testified that some of his company's activities could be viewed as a "form of blood banking," but then said that he knew of no "blood bank" that performed the surrogate test his company employed.

■ "It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citation], and its ruling will not be disturbed on appeal unless a manifest abuse of that discretion is shown." (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; see generally 3 Witkin, Cal. Evidence (3d ed. 1986) § 1844, pp. 1799-1800 and authorities cited.) We find no abuse of discretion in this instance.

The background and credentials of Dr. Allen were comparable to those of Irwin's experts and are not challenged on appeal. Irwin's sole, incorrect point on Dr. Allen is that he was "dismissed from the stand because of his evident senility."[12] The court described Allen's initial testimony as "rambling" and stated that he did not appear qualified. However, the court evidently changed its mind because Allen was later recalled to the stand and allowed to opine on Irwin's negligence. As previously noted, Allen said that Irwin should have begun anti-HBc testing in January of 1983 after receiving the CDC's surrogate testing data. The existence of qualified expert testimony on that issue is effectively conceded.

■ Irwin's principal objection to Dr. Asher, who opined on donor questioning as well as surrogate testing, is that he had never worked in a nonprofit blood bank. However, work in a particular field is not an absolute prerequisite to qualification as an expert in that field. (See *Ammon* v. *Superior Court* (1988) 205 Cal.App.3d 783, 791 [252 Cal.Rptr. 748] [physician may be competent to opine outside of specialty based on education or observation]; Evid. Code, § 720, subd. (a) [qualification may be based on education or special knowledge as well as experience].) "Members of a profession, especially those members who specialize in a particular field . . . will naturally be reluctant to testify against one another. Respect for fellow specialists, understanding of the complexities of the specialty and the margin for error, and fear of retaliation are motivations which could lead any professional to refuse to take the stand against a colleague." (*Jeffer, Mangels & Butler* v. *Glickman* (1991) 234 Cal.App.3d 1432, 1439 [286 Cal.Rptr. 243].) These considerations would apply as much to blood bankers as other professionals, and an overly strict standard of qualification could make it inordinately difficult to secure a qualified expert. (See *Brown* v. *Colm* (1974) 11 Cal.3d 639, 646 [114 Cal.Rptr. 128, 522 P.2d 688].)

[12]Allen claimed to have been the first person in the world to recognize the AIDS virus, and said that in 1971 he had traced this virus back to Haiti. He said that his discovery was acknowledged in a letter by Elliot Richardson, who was then the Secretary of the Department of Health, Education and Welfare (HEW). Allen's credibility was certainly impeached when the letter he produced, written by Richardson as Secretary of Commerce in 1977, referred only to Allen's efforts to establish a "national blood program" without mentioning any discovery. But whether Allen was too "senile" to render a competent opinion was a question for the trial court who had the opportunity to observe him, and we are not in a position to make such a finding.

Irwin notes that Asher was not a medical doctor, but again that is not conclusive. " ' "The unmistakable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts." ' [Citation.] '[I]t cannot be said as a matter of law that an individual is not qualified to give a medical opinion just because that person is not a licensed physician. [Citation.] Because of the dramatic growth of diverse interdisciplinary studies in recent times, often individuals of different nonphysician professions are called upon to give medical opinions or at least opinions involving some medical expertise.' " (*Ammon* v. *Superior Court, supra*, 205 Cal.App.3d at p. 791.) The court could reasonably find that Asher was qualified to opine against Irwin based on his education, his work with the CDC, and his experience in the commercial blood industry.

Having concluded that Drs. Allen and Asher were properly qualified as experts, we need not determine whether this was also true of Dr. O'Connor. Qualified experts opined that Irwin was negligent in the areas of surrogate testing and donor questioning, and the issue is whether those opinions precluded the granting of Irwin's motion for judgment notwithstanding the verdict.

### E. *Sufficiency of Plaintiffs' Expert Opinions*

 The standards for granting a judgment notwithstanding the verdict are the same as those for directing a verdict (see Code Civ. Proc., § 629), and "the cardinal requirement for a directed verdict is that there be no substantial conflict in the evidence" (see Cal. Judges' Benchbook—Civil Trials (CJER 1981) § 9.87, p. 317 and authorities cited). There was no conflict in the evidence on the issue of negligence in this case apart from expert opinions on the standard of care for blood banks in early 1983. On appeal from a judgment notwithstanding the verdict, we cannot "weigh" the expert opinions to the extent they were in conflict. (See *Wright* v. *City of Los Angeles, supra*, 219 Cal.App.3d at p. 343.) However, we may take into account uncontradicted testimony that Irwin was doing more than any other blood bank in the areas of its alleged negligence, and we may also consider other undisputed evidence bearing on the custom and practice of blood banks at the time. (Cf. *Enriquez* v. *Smyth* (1985) 173 Cal.App.3d 691, 697 [219 Cal.Rptr. 267] [substantial evidence of legal malpractice assessed " 'on the entire record' "].)

 Looking first at surrogate testing, the undisputed evidence is that no blood bank ran anti-HBc tests for AIDS in January and February of 1983. Although concerns about AIDS and the blood supply had recently surfaced,

no recommendations on the subject had been issued by any governmental agency, and the recommendations issued later did not endorse anti-HBc testing. The only published standards at the time were those of the AABB, ARC and CCBC, who jointly advised against any routine laboratory screening for AIDS. It is apparent that there were people at the January 4 CDC meeting and at the University who advocated anti-HBc testing. But the professional consensus at the time, reflected in both the joint statement of the blood banking associations and the universal practice among blood banks, was that further study of the test was needed. Plaintiffs' case for anti-HBc testing thus boils down to the proposition that the entire blood banking profession was negligent. We find that proposition to be untenable.

■ Plaintiffs contend that custom and practice are relevant, but not conclusive, on the standard of care. This is the general rule in cases of ordinary negligence. (See Kinney & Wilder, *Medical Standard Setting in the Current Malpractice Environment: Problems and Possibilities* (1989) 22 U.C. Davis L.Rev. 421, 439-40 [hereafter Kinney and Wilder]; Keeton, *Medical Negligence—The Standard of Care* (1979) 10 Tex. Tech L.Rev. 351, 354 [hereafter Keeton].) The leading case for this rule is *The T.J. Hooper* (2d Cir. 1932) 60 F.2d 737, 740, where Learned Hand wrote that "in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." (See also *Texas & Pacific Ry. Co.* v. *Behymer* (1903) 189 U.S. 468, 470 [47 L.Ed. 905, 906, 23 S.Ct. 622] [Justice Holmes's observation that "what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not"].) There is no question that California follows this rule in ordinary negligence cases. (See BAJI No. 3.16 (7th ed. 1986) [Evidence of Custom in Relation to Ordinary Care].)

This is a case of professional negligence, however, and we must assess the role of custom and practice in that context. The question presented here is whether California law permits an expert to second-guess an entire profession. We have found no definitive precedent on this issue and it is not one that is likely to arise.

Custom and practice are not controlling in cases, unlike ours, where a layperson can infer negligence by a professional without any expert testimony. In *Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509 [305 P.2d 36], for example, where a clamp was left in the plaintiff's body after surgery, the lack of an " 'established practice' " of counting clamps did

not preclude a finding of negligence: "[D]efendants seek to avoid liability on the theory that they were required to exercise only that degree of skill employed by other hospitals and nurses in the community. It is a matter of common knowledge, however, that no special skill is required in counting instruments. Although *under such circumstances* proof of practice or custom is some evidence of what should be done and may assist in the determination of what constitutes due care, it does not conclusively establish the standard of care." (*Id.*, at p. 519 [italics added].) Here again California follows the general rule. (See Morris, *Custom and Negligence* (1942) 42 Colum. L.Rev. 1147, 1165 [hereafter Morris].)

On the other hand, in cases like ours where experts are needed to show negligence, their testimony sets the standard of care (BAJI Nos. 6.30 and 6.37.4 (7th ed. 1986) pp. 205, 219) and is said to be "conclusive" (see *Engelking* v. *Carlson* (1939) 13 Cal.2d 216, 221 [88 P.2d 695]; disapproved on another point in *Siverson* v. *Weber* (1962) 57 Cal.2d 834 [22 Cal.Rptr. 337, 372 P.2d 97]). "Ordinarily, where a professional person is accused of negligence in failing to adhere to accepted standards within his profession the accepted standards must be established only by qualified expert testimony [citations] unless the standard is a matter of common knowledge. [Citation.] However, when the matter in issue is within the knowledge of experts only and not within common knowledge, expert evidence is conclusive and cannot be disregarded." (*Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 313 [136 Cal.Rptr. 603]; see also *Lysick* v. *Walcom, supra,* 258 Cal.App.2d at p. 156.) Qualified expert opinion will thus generally preclude a directed verdict in a professional negligence case.

 This case, however, is distinguishable. Experts' testimony ordinarily cannot be "disregarded" because it cannot be said that their opinions about what should have been done do not reflect the custom and practice of the profession. When an expert describes the "standard technique" for a knee operation (*Engelking* v. *Carlson, supra,* 13 Cal.2d 216), or what a reasonable attorney would do to settle a wrongful death action (*Lysick* v. *Walcom, supra,* 258 Cal.App.2d 136), or how long an architect should take to approve change orders on a construction project (*Huber, Hunt & Nichols, Inc.* v. *Moore, supra,* 67 Cal.App.3d 278), it is impossible to say that no surgeon, lawyer or architect was doing what the expert said was required. Here it is undisputed that no blood bank in the country was doing what the plaintiffs' experts' standard of care would require of Irwin, and we have an unusual situation where we are called upon to address the significance of a universal practice.

This issue was certified to the South Carolina Supreme Court in *Doe* v. *American Red Cross Blood Services, S.C. Region, supra,* 125 F.R.D. 637, in

the context of a claim that the Red Cross was negligent for failing to perform anti-HBc surrogate tests for AIDS before January of 1985. The federal court asked whether "professionals are always absolved from negligence liability where their conduct is consistent with generally recognized and accepted professional practices" (*id.*, at p. 642), and stated that "courts and commentators across the country are sharply split on this question" (*ibid.* [citing cases outside of California and medical malpractice commentaries]).

While it may be true that "[a]n increasing number of courts are rejecting the customary practice standard in favor of a reasonable care or reasonably prudent doctor standard" (Prosser & Keeton, The Law of Torts (5th ed., 1988 pocket supp.) p. 30, fn. 53 [citing cases outside California]), numerous commentaries have noted that custom generally sets the standard of care. (See, e.g., Kinney & Wilder, *supra*, 22 U.C. Davis L.Rev. at p. 442; King, *In Search of a Standard of Care for the Medical Profession: The "Accepted Practice" Formula* (1975) 28 Vand. L.Rev. 1213, 1235, 1245-1246 [hereafter King]; McCoid, *The Care Required of Medical Practitioners* (1959) 12 Vand. L.Rev. 549, 560, 606 [hereafter McCoid]; Morris, *supra*, 42 Colum. L.Rev. at pp. 1163-1164; Comment (1990) 61 U. Colo. L.Rev. 81, 88; and Comment (1984) 21 San Diego L.Rev. 455, 464 [suggesting that California follows this general rule].)[13]

Most commentators have urged that a customary or accepted practice standard is preferable to one that allows for the disregard of professional judgment. (Compare Keeton, *supra*, 10 Tex.Tech L.Rev. at pp. 364-365; King, *supra*, 28 Vand. L.Rev. at p. 1249; and McCoid, *supra*, 12 Vand. L.Rev. at p. 609; with Comment (1970) 23 Vand. L.Rev. 729, 745.) Indeed, the more recent commentaries are not concerned with whether customary practices should be the maximum expected of medical practitioners, but rather with whether those practices should continue to set a minimum standard in a time of increasing economic constraints. (See generally, e.g., Morreim, *Cost Containment and the Standard of Medical Care* (1987) 75 Cal. L.Rev. 1719; Havighurst, *Altering the Applicable Standard of Care* (1986) 49 Law & Contemp. Probs. 265; Note (1985) 98 Harv. L.Rev. 1004.)

 The basic reason why professionals are usually held only to a standard of custom and practice is that their informed approach to matters

---

[13]Plaintiffs are thus only partially correct when they assert that the standard of care in medical malpractice cases is "higher" than in cases of ordinary negligence. A medical practitioner is "held to the standard of practice generally accepted by his branch of the profession," but is also "protected by this standard since compliance with accepted practice is generally taken as conclusive evidence of due care." (McCoid, *supra*, 12 Vand. L.Rev. at p. 560; see also Comment (1991) 27 Willamette L.Rev. 355, 356 [ordinary negligence standard may be "higher" than professional negligence standard].)

outside common knowledge should not be "evaluated by the ad hoc judgments of a lay judge or lay jurors aided by hindsight." (King, *supra*, 28 Vand. L.Rev. at p. 1249.) In the words of a leading authority, "When it can be said that the collective wisdom of the profession is that a particular course of action is the desirable course, then it would seem that the collective wisdom should be followed by the courts." (Keeton, *supra*, 10 Tex. Tech L.Rev. at pp. 364-365.)

The "most famous . . . judicial departure from the usual rule" is *Helling* v. *Carey* (1974) 83 Wn.2d 514 [519 P.2d 981]. (Kinney and Wilder, *supra*, 22 U.C. Davis L.Rev. at 442.) In that case, the Washington Supreme Court held ophthalmologists negligent as a matter of law for failing to administer routine glaucoma tests to a patient under the age of 40, despite expert testimony from both sides that the standards of the profession did not require such testing of patients that age. The court reached this decision by balancing its perception of the seriousness of the disease against the cost of the test. (*Helling* v. *Carey*, *supra*, at p. 983 [citing Justices Hand and Holmes].)

Most of the commentary on this case has been unfavorable. A contemporary observer wrote that the *Helling* court had "unwisely . . . arrogated to itself medical decisions, superimposing its medical judgment upon the collective experience of the medical profession. Can it really be said that medical judgments of the courts will be 'right' more often than those guided by approved medical practices?" (King, *supra*, 28 Vand. L.Rev. at p. 1250; see also Keeton, *supra*, 10 Tex. Tech L.Rev. at pp. 367-8.) Such concerns may have been borne out by subsequent medical research: "It is a telling commentary on the judicial performance in the *Helling* case that medical research taking all relevant factors into account provides no convincing evidence for the cost-effectiveness of even the customary practice of screening all patients over age 40 for glaucoma. [Citation.] The Washington court, which held on the basis of its own intuition that it was negligence not to screen the plaintiff because she was *under* 40, is thus left with egg on its face." (Havighurst, *Private Reform of Tort-Law Dogma: Market Opportunities and Legal Obstacles* (1986) 49 Law & Contemp. Probs. 143, 159, fn. 45.)

 We have found only one California case endorsing *Helling* v. *Carey*.[14] *Barton* v. *Owen* (1977) 71 Cal.App.3d 484 [139 Cal.Rptr. 494], reversed a malpractice verdict for a physician because the evidence did not

---

[14]Our research indicates that *Helling* v. *Carey* has been cited only once by our Supreme Court, and distinguished, in *Truman* v. *Thomas* (1980) 27 Cal.3d 285, 295 [165 Cal.Rptr. 308, 611 P.2d 902]. The defendant in that case, Dr. Thomas, had acted as family physician for plaintiffs' decedent, Rena Truman, for several years. During that time, he periodically advised

support a jury instruction given on the patient's contributory negligence. The majority rejected various other claims of error, including an argument based on *Helling* that the doctor was negligent as a matter of law for failing to timely perform a diagnostic test. Although there was no reason to consider the point, the majority said they agreed with the patient that "custom may be negligent." (*Id.*, at p. 493.) Justice Jefferson's concurring opinion called the majority's discussion of issues other than contributory negligence "unnecessary, unwarranted and unwise dicta." (*Id.*, at p. 509.)

We have found only one precedent approving of the use of BAJI No. 3.16 (custom "not necessarily controlling" on question of "ordinary care") in a malpractice case, and that precedent is also unpersuasive. The court's only reasoning was as follows: "Since evidence of habit and custom was properly introduced, as discussed *ante,* the jury was entitled to an instruction that they had a right to consider such evidence, but that it is not necessarily controlling on the issue of ordinary care. Although the Use Note refers the user to BAJI No. 3.10 (which should not be used in a medical malpractice case [citation]) there is no reason why BAJI No. 3.16 should not be used in a medical malpractice case." (*Dincau* v. *Tamayose* (1982) 131 Cal.App.3d 780, 799 [182 Cal.Rptr. 855].) This passage confuses ordinary and professional negligence, and overlooks the reasons for the different standards of care in those contexts.

It is difficult to square these decisions with California Supreme Court cases indicating that the professional standard of care is a function of custom and practice. In *Arais* v. *Kalensnikoff* (1937) 10 Cal.2d 428, 433 [74 P.2d 1043, 115 A.L.R. 163], the court observed that experts are usually required in malpractice cases because "[o]nly physicians who practice their profession at a particular place could have any knowledge of the method of treatment customarily used by the other members of the profession practicing there." The rule that judged physicians by the practices in a particular

---

her to undergo a pap smear test but she declined. She was eventually diagnosed with inoperable cervical cancer and died at the age of 30. Her children sued for wrongful death and requested a jury instruction, based on *Helling,* that a physician who failed to perform a pap smear test on a female patient over the age of 23 was negligent as a matter of law. The court noted that *Helling* did not apply because the doctors in that case had failed to recommend a glaucoma test, whereas Dr. Thomas had recommended a pap smear, and that thus the instruction was properly refused.

A 4-3 majority also held that Dr. Thomas could be liable for neglecting to inform Truman of the risks of failing to have a pap smear. The majority noted that custom does not define the scope of a doctor's duty to secure an informed consent. (*Truman* v. *Thomas, supra,* 27 Cal.3d at p. 291, fn. 3; see also *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1].) Since laypersons can ordinarily determine what information would be significant to a patient, "informed consent" cases are like other cases where professional negligence can be inferred without expert testimony, and they can be appropriately excepted from the rule that practice determines the standard of care. (See King, *supra,* 28 Vand. L.Rev. at pp. 1261-1265.)

locality was broadened into a standard of practice in "similar circumstances" (see generally Comment (1972) 7 U.S.F. L.Rev. 163), but custom continued to define the standard of care. In *Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757], the court stated that "it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify to the degree of care against which the treatment given is to be measured."

More recently, in *Landeros* v. *Flood, supra,* 17 Cal.3d 399, the court considered whether a cause of action for malpractice could be stated for failure to diagnose the battered child syndrome. The trial court had sustained the defendants' demurrers and dismissed the case. The Supreme Court reversed, observing that battered child syndrome had been widely reported in the medical literature prior to the plaintiff's treatment, and thus it could not be said as a matter of law that the defendants were not negligent in failing to recognize the syndrome. Justice Mosk's opinion for a unanimous court, however, also noted that proof of the standard of care would require expert testimony on whether the procedures recommended in the literature had actually become the norm within the profession: "The question is whether a reasonably prudent physician examining this plaintiff in 1971 would have been led to suspect she was a victim of the battered child syndrome from the particular injuries and circumstances presented to him, would have confirmed that diagnosis by ordering X-rays of her entire skeleton, and would have promptly reported his findings to appropriate authorities to prevent a recurrence of the injuries. There are numerous recommendations to follow each of these diagnostic and treatment procedures in the medical literature cited above.

"Despite these published admonitions to the profession, however, neither this nor any other court possesses the specialized knowledge necessary to resolve the issue as a matter of law. We simply do not know whether the views espoused in the literature *had been generally adopted in the medical profession by the year 1971, and whether the ordinarily prudent physician was conducting his practice in accordance therewith.* The question remains one of fact, to be decided on the basis of expert testimony . . . ." (*Landeros* v. *Flood, supra,* 17 Cal.3d at pp. 409-410 [footnote omitted, italics added].)

The highlighted language in *Landeros* v. *Flood* describes the subject of expert testimony in a malpractice case somewhat differently than *Arais* v. *Kalensnikoff, supra,* and *Sinz* v. *Owens, supra.* The court does not refer to custom, and its discussion suggests that the lack of an established custom for

diagnosing and treating battered child syndrome would not preclude a finding of negligence if it could be said that professional admonitions on the subject had been "generally adopted." The court may thus have moved beyond a customary practice standard to one of "accepted" practice, based on "reasonable expectations that the profession collectively holds for its members" rather than "tradition and habit." (King, *supra*, 28 Vand. L.Rev. at p. 1241; see also *id.* at p. 1243 [proof of accepted practice may be based inter alia on "the best of available medical literature"].)

■■■■ Like the earlier cases, however, *Landeros* v. *Flood* confirms that professional prudence is defined by actual or accepted practice within a profession, rather than theories about what "should" have been done. The issue was not the existence of recommendations with respect to battered child syndrome, but whether physicians were "conducting [their] practice in accordance therewith." This is implicit in the definition of the standard of care as skill and knowledge "ordinarily possessed *and exercised*" in a profession. (*Landeros* v. *Flood, supra*, 17 Cal.3d at pp. 408, 410 [italics supplied].)

It follows that Irwin cannot be found negligent for failing to perform tests that no other blood bank in the nation was using. Judgment notwithstanding the verdict was properly granted to Irwin on the issue of anti-HBc testing because there was no substantial evidence that failure to conduct the tests was not accepted *practice* for blood banks in January and February of 1983.

This conclusion is consistent with most of the reported blood bank cases in other jurisdictions. (Compare *Doe* v. *American Red Cross Blood Services, supra*, 377 S.E.2d at pp. 325-326, and *Doe* v. *American Red Cross Blood Services, S.C. Region, supra*, 125 F.R.D. at p. 641 [blood bank not negligent for failing to surrogate test for AIDS because such tests were not a "generally recognized and accepted" professional practice]; *Hines* v. *St. Joseph's Hospital, supra*, 527 P.2d at p. 1078 [blood bank not liable for transmission of hepatitis because use of paid donors complied with governmental regulations, standards of professional group and blood bank's internal regulations]; and *Hutchins* v. *Blood Services of Montana, supra*, 506 P.2d at p. 452 [blood bank not negligent for failing to use surrogate test for hepatitis that no other blood bank employed]; with *United Blood Services* v. *Quintana* (Colo. 1992) 827 P.2d 509 [prevailing practice with respect to surrogate testing for AIDS may have been deficient]; and *Vuono* v. *New York Blood Center, Inc.* (D.

Mass. 1988) 696 F.Supp. 743, 746-747 [custom for testing and inspection of blood product containers may have been unreasonable].)[15]

We now turn to the allegations about donor screening.

■■■ Dr. Asher criticized the AIDS-related questions Irwin used in the immediate aftermath of the CDC meeting. However, there were no published standards for such questions at the time, and there was no evidence that any particular questions were generally adopted by blood banks during this period. We find no substantial evidence on the record as a whole that Irwin did not follow accepted practice among blood banks for donor questioning prior to January 19, 1983.

Asher's principal criticism and the thrust of plaintiffs' case on donor screening was that Irwin should have begun asking donors prior to February 8 about their sexual orientation. It is undisputed, however, that Irwin started asking such questions when they were labelled "inappropriate" in the only published standards on the subject. There was evidence that Irwin was "reluctant" to screen out homosexual donors and, if Asher's company was a "blood bank," then there was evidence that one blood bank started asking questions about homosexuality before Irwin. There was no evidence that sexual preference questioning was generally adopted by blood banks before February 8, 1983. We find no substantial evidence that Irwin failed to follow accepted practice among blood banks in this area.

Asher said that the AIDS-related questions Irwin began asking on February 8 were "inadequate," but his only specific criticism was that Irwin should have required its donors to attest that they were "safe." It is undisputed that the questions Irwin developed by February 8 covered all of the pertinent symptoms and relevant contacts with high-risk groups, and that other blood banks eventually adopted those questions. It is also undisputed that Irwin required its donors to aver that they understood the medical histories they provided. We find no substantial evidence that Irwin failed to follow accepted practice in the area of donor questioning from February 8, 1983, to February 24, 1983, the date of Michael's operation.

Asher also criticized Irwin for allowing donors to fill out their own medical history cards, but that practice was irrelevant in light of the uncontradicted evidence that medical personnel asked all of Irwin's AIDS-related questions before Michael's operation.

---

[15]*Kirkendall* v. *Harbor Ins. Co., supra,* 698 F.Supp. at pp. 778-780, and *Kozup* v. *Georgetown University, supra,* 663 F.Supp. at p. 1057-1058, contain language cutting both ways on whether accepted practice sets the standard of care for blood banks. Dicta in *Snyder* v. *Mekhijian* (1990) 244 N.J.Super. 281 [582 A.2d 307, 313], suggests that the AABB may have been negligent for failing to adopt standards that would have required surrogate testing for AIDS.

Insofar as it appears from the record, Irwin was a pioneer in the profession in the area of donor questioning. Accordingly, Dr. Asher's opinions about what Irwin "should" have done were not substantial evidence of negligence. Substantial evidence "is not synonymous with 'any' evidence. To constitute sufficient substantiality to support the verdict, the evidence must be 'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' " (*Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 51 [248 Cal.Rptr. 217].)

 We conclude that plaintiffs did not present a prima facie case of negligence with respect to donor questioning, and that Irwin was entitled to judgment notwithstanding the verdict on negligence.[16]

## IV. CLAIMS AGAINST THE UNIVERSITY

The court granted the University's motions for nonsuit and directed verdict on every claim against it. Plaintiffs contend that these rulings were erroneous on eight of their nine claims. However, giving plaintiffs' evidence "all the value to which it is legally entitled," we find "no evidence of sufficient substantiality to support a verdict" against the University. (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].)

### A. *Intentional and Negligent Misrepresentation*

 Plaintiffs submit that University personnel misrepresented Irwin's directed donations policy, and fraudulently or negligently asserted that Irwin's blood supply was safe. There is no evidence of any representation by anyone at the University on either subject.

This portion of plaintiffs' case was based solely on the Osborns' conversation with Dr. Stanger before Michael's surgery, when they asked about directed donations. According to Paul Osborn, "we wanted to know whether it was possible for us to donate our own blood specifically to be given to Michael, and [Stanger] told us that wasn't a possibility, that they got all their blood from Irwin Memorial Blood Bank and that they were under contract to

---

[16]In view of this conclusion, we do not reach any of Irwin's arguments for a new trial of the claim of negligence. We also do not reach any of the arguments about the application of MICRA, because the parties have not briefed the threshold question of whether a claim based on a negligent misrepresentation by Irwin's receptionist is one of "professional negligence" within the meaning of MICRA. (Civ. Code, §§ 3333.1, subd. (c)(2), 3333.2, subd. (c)(2); Code Civ. Proc., § 667.7, subd. (e)(4).) With that issue and liability unresolved, we have no occasion to address the various problems associated with the trial court's modification of the jury's damage award.

them or with them to get all their blood from them. And that was about the end of that conversation. He suggested that if we wanted to take the matter further that it would be best for us to take it up with Irwin." Mary Osborn gave essentially the same account. She testified that Stanger said "we couldn't donate our own blood for Michael, that U.C. had a contract with Irwin Memorial Blood Bank that if they were to get any blood from Irwin for any of their patients, they had to get all their blood from Irwin. [¶] And so we—if anything, we would need to take it up with Irwin."

These statements attributed to Dr. Stanger did not refer to the safety of Irwin's blood supply, and they cannot reasonably be interpreted as a representation about Irwin's directed donations policy. In light of Stanger's advice that Irwin furnished all of the blood used at the University, and his suggestion that directed donations be discussed with Irwin, his statement that such donations were impossible could only have been taken as a representation that the Osborns could not donate their blood at the University. This must have been the Osborns' understanding because they proceeded to renew their inquiry at Irwin. It is undisputed that the University did not collect any blood for transfusion. In the absence of any evidence of an untrue statement of a material fact (BAJI Nos. 12.31 & 12.45 (7th ed. 1986) pp. 23, 32), the University's motions for nonsuit and directed verdict were properly granted on the misrepresentation claims.

B. *Professional and Ordinary Negligence*

 Plaintiffs' contend that the University was negligent for using Irwin as its sole blood supplier, and for not performing anti-HBc surrogate tests on the blood Irwin supplied. Plaintiffs also argue that the University was negligent because it "incorrectly advise[d]" them "regarding the alleged non-availability of directed donations," but this argument is just a restatement of the negligent misrepresentation theory, and it fails for the reasons set forth in the preceding section.

The merits of the University's policies for blood testing and procurement were issues of professional negligence. A hospital is required to exercise the degree of care, skill and diligence used by other hospitals in similar circumstances. (*Wood* v. *Samaritan Institution* (1945) 26 Cal.2d 847, 851 [161 P.2d 556]; see also *Valentin* v. *La Societe Francaise* (1946) 76 Cal.App.2d 1, 6 [172 P.2d 359] [hospital must afford the "treatment customarily administered" by similar hospitals at the time].) The feasibility of routine anti-HBc testing at a hospital, and the relationship between hospitals and blood banks, are not matters of common knowledge. Expert testimony was therefore needed to support the claims of negligence in these areas. (See

*Contreras* v. *St. Luke's Hospital* (1978) 78 Cal.App.3d 919, 927 [144 Cal.Rptr. 647].)

Plaintiffs elicited no expert opinion on the University's alleged negligence. Asher was asked whether the University should have run surrogate tests on the blood it received from Irwin, but the defense objected that Asher's expertise on hospital procedure had not been established, and the question was never answered. The objection was sustained and the matter was never renewed. Asher's brief testimony about the relationship between hospitals and blood banks was critical of Irwin rather than the University. Dr. Allen was asked whether he was critical of the University for using Irwin as its sole blood supplier. Again, however, the court sustained an objection to the question and the matter was dropped.

We need not assess the undisputed evidence that the University's relationship with Irwin was the same as that of all other hospitals in the area, or the uncontradicted testimony that no hospital in the nation surrogate tested blood for AIDS in early 1983. Plaintiffs do not argue that their experts were improperly prevented from opining on the University's negligence, and thereby abandon any claim of error in connection with the judgment for the University on that issue.

C. *Intentional and Negligent Infliction of Emotional Distress*

We recognize that Mr. and Mrs. Osborn have suffered greatly because of the tragic outcome of Michael's surgery. Settled law, however, precludes any recovery against the University for their emotional distress.

██ One of the elements of a prima facie case for intentional infliction of emotional distress is "extreme and outrageous conduct by the defendant . . . . Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975].) Nonsuit was properly granted on the claim of intentional infliction of emotional distress because there was no evidence of any outrageous conduct by anyone at the University.

The record is also devoid of any evidence of negligence on the part of anyone at the University, and that is dispositive of the claim of negligent infliction of emotional distress. (See *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 667-668 [257 Cal.Rptr. 865, 771 P.2d 814] [listing elements of claim for emotional distress caused by observing third person's "negligently inflicted injury"]; *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.*

(1989) 48 Cal.3d 583, 588, 590 [257 Cal.Rptr. 98, 770 P.2d 278] ["breach of duty" a prerequisite to recovery on direct victim theory].)

D. *Other Claims*

 The record also fails to support plaintiffs' claim of battery. Physicians can commit a battery if the treatment they administer is "substantially different" than the treatment to which the patient has consented. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 239.) This principle has been extended to the transfusion of blood from homologous donations, if the patient has only consented to receive blood from directed donations. (*Ashcraft* v. *King* (1991) 228 Cal.App.3d 604, 611-613 [278 Cal.Rptr. 900].) Here the Osborns consented to Michael's operation knowing that it would entail transfusions, and that the blood would not come from directed donations. There was no evidence that the surgery differed in any respect from what was contemplated.

 Plaintiffs maintain that they have a claim for breach of contract based on the theory of promissory estoppel. However, we find no evidence of detrimental reliance by plaintiffs on any promise by the University. (See generally 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 249, p. 251 and authorities cited.)

Plaintiffs assert finally that the court erred in granting a nonsuit for the University on a claim of strict liability. This argument is anomalous because plaintiffs did not even plead a strict liability claim against the University.

V. DISPOSITION

The judgment against Irwin is reversed, and the case is remanded for a new trial of the negligent misrepresentation claim against Irwin. The judgment for Irwin on all other causes of action, and the judgment in favor of the University, are affirmed. Plaintiffs and Irwin shall each bear their own costs on Irwin's appeal and plaintiffs' cross-appeal against Irwin. Plaintiffs shall pay the University's costs on their cross-appeal against the University.

Anderson, P. J., and Poché, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied July 9, 1992. Mosk, J., Kennard, J., and George, J., were of the opinion that the petition should be granted.